**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| SCOTT L.,[1]<br><br>Plaintiff,<br><br>vs.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | No. 25-CV-2021-KEM<br><br>**MEMORANDUM OPINION AND ORDER** |

---

Plaintiff Scott L. seeks judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Plaintiff argues that the administrative law judge (ALJ), John Priester, erred in evaluating his subjective complaints and in failing to include a residual functional capacity (RFC) limitation encompassing the moderate limitations in mental functioning the ALJ found at step three. I recommend **affirming** the ALJ's decision.

## *I. BACKGROUND*

Plaintiff was born in 1981 and obtained his GED in 1999 and later, an associate's degree. AR 24, 279, 815-16.[2] Around 2010, he lived in Michigan with his young family, and he worked for a satellite dish company for a year or two, installing dishes, running

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States recommends that, due to significant privacy concerns in social security cases, federal courts refer to claimants only by their first names and last initials.

[2] "AR" refers to the administrative record below (Doc. 7).

wires, and setting up programming boxes. AR 42, 710. In 2011 and 2012, he worked at a feed mill, checking out customers, stocking retail products, and coordinating feed purchases. AR 41-42, 252-53, 266. In 2013, he worked as the assistant manager at a Dollar General for about six months; with only two people working at a time, he basically served as a store clerk, unloading trucks, stocking shelves, checking out customers, cleaning the bathroom, and making bank deposits. AR 40-41, 266, 710. From 2013 to 2020, he worked for a company doing mobile IT[3] repairs, sometimes driving 1,600 miles a week to perform repairs on commercial and residential electronics (televisions, computers, printers, etc.). AR 40, 251-57. He started in a part-time position and moved from Michigan to Iowa to continue his role full time. AR 710. He was furloughed in March 2020 due to the pandemic, received unemployment, and was eventually terminated in early 2021 (and had to file for bankruptcy). *Id.* He also divorced his wife in 2020. AR 709. He briefly worked at Fleet Farm in 2021, "doing more of a physical job." AR 258, 488. From late 2021 to May 2022, he worked in IT for a manufacturing plant for about six months, working on networking, repairing printers, file-sharing privileges, and other IT needs. AR 39, 258-59, 266. Plaintiff told a cardiologist in November 2022 that he "quit his job in IT repair [in May 2022] to focus on his health [and] get to the bottom of" his heart palpitations, while he told a Social Security examiner in March 2023 that he "was let go . . . due to excessive absences related to his health issues." AR 534, 710.

While Plaintiff was still working, on June 3, 2021, he met with his primary care provider, Brian Ray, DO. AR 473-77. He reported that since starting sertraline a month ago, he had not noticed any improvement in his anxiety. He also noted a history of peripheral neuropathy and said he tried increasing his nortriptyline (Pamelor) dosage, but it made him tired and did not "help his symptoms all that much" (his current dosage was 100 mg nightly). His blood pressure was 120/62 and pulse 70. On psychiatric objective

[3] Information technology.

examination, Dr. Ray noted Plaintiff made normal eye contact and answered questions, did not have psychomotor agitation or depression, and appeared slightly anxious but not depressed. Dr. Ray stopped sertraline and started Cymbalta (duloxetine, 30 mg once daily) for anxiety, noting the Cymbalta might also help Plaintiff's peripheral neuropathy. At appointments with Dr. Ray in 2021 and early 2022 for unrelated issues, Dr. Ray's treatment notes reflect Plaintiff's blood pressure was 122/70 and pulse 95 in July 2021 (AR 480); blood pressure 124/74 and pulse 121 in September 2021 (AR 488); blood pressure 120/70 and pulse 99 in December 2021 (AR 492); blood pressure 122/84 and pulse 72 in February 2022 (AR 499); and blood pressure 138/84 and pulse 121 on April 15, 2022 (AR 509).

On April 21, 2022, Plaintiff had an appointment with Dr. Ray. AR 444-48, 516. He reported heart palpitations "going on for a while and getting worse." He said he had been previously evaluated by a cardiologist when he lived in Michigan, but doctors found no specific cause for his symptoms. He reported feeling frequent fatigue. He said he had some anxiety, including about his heart symptoms, but noted he felt better since starting Cymbalta. His blood pressure was 120/70 and pulse 104. On objective cardiovascular examination, Dr. Ray noted regular rate and rhythm, S1 and S2 normal, no murmur, no rub, and no gallop.[4] Dr. Ray noted Plaintiff's labs at his annual physical last year were "good" and stated it was "very possible he [has] sleep apnea which could be the entire cause of his symptoms or at least part of his symptoms." He referred Plaintiff to cardiology.

On May 3, 2022, Plaintiff met with cardiologist Aref Bin Abdulhak, MD. AR 351-55. Plaintiff reported that nineteen years ago, he suffered heart palpitations, and

[4] Other cardiovascular objective examinations throughout the relevant period (by various providers) reflect similar findings (other than sometimes acknowledging the tachycardic heart rate). AR 354, 370, 386, 407, 424, 535, 721, 850, 867, 910, 1113.

doctors used a camera to look inside his heart (likely an electrophysiology (EP) study),[5] which revealed nothing wrong. He had been doing well until a few months ago when he started feeling his heart suddenly racing again, for one to three hours. He reported suffering these episodes daily and denied chest pain or discomfort, syncope, or presyncope. His blood pressure was 114/70 and pulse 126. Dr. Bin Abdulhak observed normal mood and affect. He concluded that an EKG[6] from that same day was consistent with sinus tachycardia[7] but could not rule out the possibility of atrial tachycardia coming close from the sinus mode. Dr. Bin Abdulhak ordered an echocardiography, thyroid labs, and a Holter monitor to see the onset and offset of symptoms. He directed Plaintiff to call 911 with worsening symptoms and follow up in four weeks.

On May 18, 2022, Plaintiff called Dr. Bin Abdulhak's office, reporting worsening heart palpitations, increased tingling in his arms, and chest pain and shortness of breath as of that morning. AR 941. The nurse directed him to go to the ER or if the chest pain and shortness of breath were severe, call 911. Plaintiff said somebody could take him to the ER. There is no record that Plaintiff went to the ER.

On May 25, 2022, Plaintiff returned to Dr. Bin Abdulhak. AR 367-70. Dr. Bin Abdulhak noted Plaintiff's echocardiography and thyroid labs were normal, and he had not yet received the results from the Holter monitor. Plaintiff reported that he could feel his heart racing 85% of the day and that "his heart rate goes from 118-126." He reported dizziness at times but continued to deny syncope, presyncope, breathing difficulties, and

---

[5] *See* AR 368.

[6] Electrocardiogram.

[7] Tachycardia means a heart rate faster than 100 beats per minute. With sinus tachycardia, electrical signals from the heart's sinoatrial node tell the heart to beat faster than normal, and with atrial tachycardia, the atria (the upper chambers of the heart) beat faster than normal. *See* ***Sinus Tachycardia***, Cleveland Clinic, (June 5, 2022) https://my.clevelandclinic.org/health/diseases/23210-sinus-tachycardia; ***Atrial Tachycardia***, Cleveland Clinic, (June 25, 2025) https://my.clevelandclinic.org/health/diseases/21800-atrial-tachycardia.

chest discomfort. He noted his significant other reported he snored loudly and stopped breathing during sleep. Dr. Bin Abdulhak's treatment note reflects Plaintiff smoked a half pack of cigarettes a day and "reports that he is drinking 10 beers a day since age 13 but he is not withdrawing now"; other treatment notes from 2022 (from Dr. Ray and the Mayo Clinic) reflect Plaintiff reported drinking 10 beers a *week* (AR 460, 465, 568, 644). Diagnoses included tachycardia, palpitations, and chronic fatigue. Plaintiff's blood pressure was 118/86 and pulse 117. An EKG noted sinus tachycardia with incomplete right bundle branch block and left anterior fascicular block. AR 381. Dr. Bin Abdulhak directed Plaintiff to meet with cardiologist Talha Farid, MD, that same day; referred him for a sleep study; and told him to follow up in a year.

At Plaintiff's cardiac EP appointment, Dr. Farid noted the echocardiogram performed earlier in the month showed a structurally normal heart, with normal systolic function, ejection fraction of 63%, normal left atrial size, and no significant valvular heart disease. AR 382-88. Plaintiff stated he had suffered from palpitations for a long time, but they had worsened in the last few years. He stated he felt out of rhythm most of the time. He denied sudden onset and offset. He also reported worsening symptoms of dizziness, lightheadedness, fatigue, and shortness of breath, but continued to deny presyncope and syncope. His blood pressure was 118/86 and his pulse was 117, which Dr. Farid noted was tachycardic. Dr. Farid wrote he reviewed Plaintiff's primary care provider's records, which indicated he was tachycardic most visits "with heart rate anywhere between 102 [and] 130" beats per minute, "but there are other times when his heart rate . . . is about 60 or 70." This made Dr. Farid "think that this is likely atrial tachycardia[,] though we have not documented sudden onset or offset." Dr. Farid acknowledged "the P wave morphology is similar to sinus" tachycardia but concluded his was likely "atrial tachycardia coming from crista terminalis." Because Plaintiff reported not feeling well during tachycardia, Dr. Farid prescribed metoprolol succinate (Toprol-XL) (25 mg) once daily. Dr. Farid noted he would wait to receive the results

from the Holter monitor to confirm, then proceed with a crista ablation if supported by the data (which he noted came with a "relatively high risk of sinus node dysfunction due to proximity of the crista terminalis to the S-A node").

On May 28, 2022, Plaintiff called Dr. Farid's office, requesting to increase his heart medication dosage. AR 935. The on-call doctor increased his metoprolol dosage (from 25 to 50 mg).

On June 13, 2022, Plaintiff returned to Dr. Farid. AR 404-11. An EKG showed sinus rhythm and incomplete right bundle branch block. Plaintiff stated the increased metoprolol dosage improved his symptoms so that he was "out of rhythm about 50% of the time as oppos[ed] to almost 100% previously." At the appointment, his heart rate was around 70 beats per minute. Dr. Farid reviewed the Holter monitor and noted "a lot of artifact in the onset/offset arrhythmias not clear."[8] The Holter monitor also "showed intermittent episodes of narrow complex tachycardia." AR 423; *see also* AR 943. Dr. Farid discussed options, including ablation (surgery) and antiarrhythmics, and Plaintiff elected to try medications first. Dr. Farid added flecainide (50 mg, twice a day).

On June 20, 2022, Plaintiff presented to Dr. Farid's office for an EKG. AR 931, 1056-57. It showed "sinus rhythm" and "first degree AV block," with a heart rate of 94. Plaintiff told the nurse that the flecainide had "really started to work consistently in the last [two] days" and "he now fe[lt] well with no concerns." Based on the EKG results, Dr. Farid directed Plaintiff (by telephone) to continue the same medications.

On June 23, 2022, a note from Dr. Farid's office reflects that Plaintiff "no showed" his appointment with pulmonology that morning (the sleep referral). AR 931.

---

[8] Artifacts are "electrocardiographic alterations, not related to cardiac electrical activity," which can be caused by "tremors, . . . anxiety, hyperthyroidism, . . . drugs . . . , [or] shivering," among other things. **Andrés Ricardo Pérez-Riera, et al.,** ***Main Artifacts in Electrocardiography***, 23 Ann. Noninvasive Electrocardiology, no. 2, Sept. 20, 2017, https://onlinelibrary.wiley.com/doi/epdf/10.1111/anec.12494.

On July 6, 2022, Plaintiff had another appointment with Dr. Farid. AR 421-27, 432. He reported his symptoms were worsening and occurring daily and every time he ate. He said his heart rate was usually in the 120s at rest. At the appointment, his blood pressure was 120/82 and his pulse was 109. An EKG showed sinus tachycardia and incomplete right bundle branch block. Dr. Farid concluded Plaintiff was "either having atrial tachycardia from crista terminalis or . . . inappropriate sinus tach versus sinus node reentry." Dr. Farid increased the flecainide dosage (to 100 mg, twice a day) and ordered an EKG in a week. Dr. Farid noted they would schedule an ablation procedure and directed him to follow up with his nurse practitioner in three months.

On July 15, 2022, Plaintiff met with Dr. Ray. AR 457-61. His blood pressure was 118/79 and his pulse was 79. Dr. Ray noted his cardiology testing "was essentially unremarkable," but Plaintiff did not think his Holter monitor showing sinus tachycardia was accurate because "he claims he pushed the button a lot more than what was recorded on there." Plaintiff continued to report "fairly significant symptoms" despite medication. Dr. Ray recommended he do a sleep study "to evaluate and exclude or treat sleep apnea" and referred him for a different cardiologist for a second opinion.

In the latter half of July and early August, Plaintiff received treatment from Dr. Farid's office through EKGs and telephone messages. Plaintiff had an EKG on July 13, 2022. AR 925-27, 1048. He told the nurse he did not feel much better after the increased flecainide dosage and still experienced shortness of breath and heart racing. The EKG showed "sinus rhythm" and "incomplete right bundle branch block," with a heart rate of 85. Via telephone message on July 20, Dr. Farid noted Plaintiff's EKG "look[ed] okay," but if he did not feel well on the higher dosage of flecainide, he could go back to the previous lower dosage (50 mg twice daily). Plaintiff asked about repeating the Holter monitor test, since he felt "the last one did not include all the times he actually pushed the button when he was symptomatic." Dr. Farid did not think it would help or that insurance would approve this. When this message was relayed to the Plaintiff on July

25, he asked about switching to a different medication due to his "heart racing (running 120-125)" and "shortness of breath and chest pain that comes on with the high heart rates." The nurse noted the most recent EKG did not show a high pulse, and Plaintiff said it was lower that day. Dr. Farid's office scheduled Plaintiff to come in for an EKG the next day, July 26, which showed a heart rate of 125, as well as "sinus tachycardia" and "incomplete right bundle branch block." AR 1046. His blood pressure was initially 142/98 but came down to 132/82. AR 921-22. The nurse observed he was diaphoretic[9] with "cool and clammy" skin. Plaintiff reported feeling short of breath, lightheaded, and dizzy, worse with activity, and feeling like "he is going to pass out at times" (he stopped to rest to "keep from passing out"). Plaintiff requested an alternative to flecainide. Dr. Farid stopped that medication and started Plaintiff on diltiazem (Cardizem) (120 mg daily), directing him to monitor his blood pressure and heart rate for a week or two and then call with the results. When the diltiazem did not work well enough on its own, Plaintiff took some old flecainide along with the diltiazem to lower his heart rate even more, stating his heart rate was now in the 70s and he felt better. AR 919-21. The nurse noted he was not prescribed both medications at the same time and instructed him not to take any more flecainide. Plaintiff requested to increase his diltiazem dosage. On August 8, 2022, Dr. Farid increased Plaintiff's metoprolol dosage (to 200 mg). *See also* AR 466.

On August 2, 2022, Plaintiff filed the current applications for DI and SSI benefits, alleging an onset date of May 3, 2022. AR 56. He alleged disability based on recurrent arrhythmia, sinus tachycardia, right bundle branch block, and peripheral neuropathy.

On August 31, 2022, Plaintiff had an appointment with Dr. Ray. AR 465-69. Dr. Ray noted Plaintiff had a history of chronic peripheral neuropathy treated with nortriptyline. Plaintiff reported with his recent medication changes, his blood pressure

---

[9] Excessively sweating. ***Diaphoresis***, Cleveland Clinic (Nov. 28, 2022) https://my.clevelandclinic.org/health/diseases/24496-diaphoresis.

and pulse were better, but "he [wa]s having some fatigue." He noted concerns about a planned ablation procedure in December and requested a second opinion. His blood pressure was 126/68 and his pulse was 89, which Dr. Ray indicated was much better, so he recommended Plaintiff continue the same dosage of metoprolol and diltiazem. Dr. Ray indicated he would refer Plaintiff to a cardiologist at the University of Iowa Hospital system for a second opinion. Dr. Ray's treatment note also lists Cymbalta as a "discontinued medication[]."

On September 11, 2022, Plaintiff completed a function report for the Social Security Administration. AR 286-93. He reported "shortness of breath, dizziness, fatigue, excessively sweating, chest pounding, lightheadedness, inaccurate depth perception, problems balancing while standing or walking, lessened ability to control muscle movements, muscle spasms, tremors, inability to concentrate and focus, clarity of thought, [and] numbness and inability to use arms, hands and legs for any extended period." He described a typical day as taking his medications, microwaving food "sometimes," watching over and verbally instructing his children, taking naps when necessary, periodically checking his heart rate and blood pressure, reading news articles, showering, updating his calendar with appointments, eating, talking to family members about their day, and going to bed. He stated he could no longer play football, concentrate, work out and exercise, work on cars, or fix computers. He stated dressing, bathing, and shaving were difficult due to troubles balancing, focusing, cramping, shaking, and tremors. He prepared simple meals daily (sandwiches, burritos, egg rolls, microwave dinners); he previously prepared oven meals. He reported being able to do laundry for an hour every three days or so, but he had to "lay down for a bit when [he] g[o]t too exhausted, dizzy, or hot." He said he shopped for groceries once a month for about two to three hours. His hobbies included reading the news (daily), playing cards (twice a month), and watching movies (twice a month). He said he hardly went anywhere other than fast food restaurants and his parents' house, no longer attending church or going to

friends' houses. He said he could walk forty yards before needing to stop and rest for five to ten minutes. He thought he could pay attention for ten to thirty minutes. He reported he could follow written but not verbal instructions due to his "lack of mental clarity." He checked boxes indicating he had issues with lifting, squatting, bending, standing, reaching, walking, sitting, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, and using his hands.

On September 26, 2022, Plaintiff went to urgent care for a toe issue. AR 912-13. His blood pressure was 128/80 and pulse 107.

On October 14, 2022, Plaintiff met with a nurse practitioner at Dr. Farid's cardiology practice. AR 908-12. Plaintiff reported continued symptoms, noting his heart rate at rest was in the 110s to 120s and his blood pressure was intermittently elevated (systolic as high as 150 and diastolic in the low 100s). He noted continual fatigue, dizziness and lightheadedness, chest pain, racing heart, and shortness of breath, but denied syncope or presyncope. At the appointment, his pulse was 116 and blood pressure 132/74. The EKG showed sinus tachycardia and incomplete right bundle branch block and left anterior fascicular block (not new). The provider increased Plaintiff's diltiazem dosage (to 240 mg daily) and noted the tentative plans for the ablation in December, depending on the outcome of his upcoming consult with the Mayo Clinic.

On October 25, 2022, Plaintiff met with an internist at the Mayo Clinic. AR 643-46, 815-16. He reported suffering heart palpitations for the past ten years that had become more severe and frequent with associated dizziness, lightheadedness, significant fatigue, and shortness of breath, but no syncope. The doctor noted Plaintiff's echocardiogram in May was unremarkable and his Holter monitor "showed an average heart rate of 109 with about half of his time in sinus tachycardia." He had been seen by sleep medicine, but it was "unclear if he was fully evaluated with a [sleep study] for sleep apnea." Plaintiff reported that his diltiazem dosage had recently doubled last week at his request because his heart rate was still in the 115s. Since increasing the dosage, his heart

rate had decreased to the 90s, but he still felt significant fatigue. He also noted high blood pressure since starting metoprolol (in the 160/110 range), with occasional blurred vision (but not headaches) "when he feels like his blood pressure is high." He also sought treatment for "neuropathy that manifests as widespread body pruritus[10] and numbness/tingling sensations of his hands and feet," which he reported suffering for several years. Plaintiff reported drinking alcohol four or more times a week, typically three to four drinks, with six "or more drinks on one occasion" "less than monthly." He denied exercising and reported feeling stressed "rather much." On objective examination, the doctor found Plaintiff answered questions appropriately and had appropriate mood and affect, with no peripheral edema in his extremities and a regular heart rate. The doctor noted that Plaintiff believed one diagnosis could tie his symptoms together, but the doctor explained they could be unrelated. The doctor concluded Plaintiff's symptoms could potentially be explained by autonomic dysfunction or central sensitization but noted they would also have to rule out other causes of high blood pressure. The doctor ordered numerous labs and heart screenings and referred Plaintiff to neurology, dermatology, and cardiology. A chest X-ray was normal. AR 642. An EKG showed sinus rhythm with first degree atrioventricular block but was otherwise normal. AR 641. An EMG[11] was normal, indicating "no electrophysiological evidence of a length-dependent sensorimotor peripheral neuropathy" in the upper or lower extremities. AR 636-38. An overnight oximetry test was conducted, revealing "abnormal oximetry consistent with moderate sleep disordered breathing with significant hypoxemia likely occurring REM sleep stage." AR 634.

The next day, on October 26, 2022, Plaintiff met with a dermatologist resident at the Mayo Clinic. AR 604-05. Plaintiff said "pruritus in the setting of peripheral

---

[10] Itchy skin. ***Pruritus***, Cleveland Clinic, (June 6, 2022) https://my.clevelandclinic.org/health/diseases/11879-pruritus.

[11] Electroymyogram.

neuropathy . . . started approximately [nine] years ago." Plaintiff said he had been taking nortriptyline (50 mg, twice a day) for about seven years and "his pruritus and sensation of crawling under the skin" were completely gone on this medication, but if he missed a dose, he would suffer "mild symptoms the following day," and if he missed two doses in a row, his itching would be severe. He reported he was happy with his current regimen and did not suffer side effects "aside from possible slight drowsiness." The doctor ordered blood tests to rule out possible causes of pruritus.

On October 27, 2022, Plaintiff presented to vestibular rehabilitation occupational therapy at the Mayo Clinic. AR 573-79. Plaintiff reported intermittent dizziness lasting thirty to forty-five minutes, describing his symptoms as a lightheaded or foggy sensation, with accompanying shortness of breath and fatigue. He said his dizzy spells happened daily and started in May. He wondered whether his cardiac or nerve issues were related. He reported activities of daily living included laundry and home repairs such as replacing door handles. He stated his symptoms were aggravated with turning his head, riding in a car, being in a busy environment, exercising, or doing chores, and were relieved with rest or lying down. The "clinical impression" was "mild unsteadiness, visual and motion sensitivity possibly secondary to an evolving persistent postural perceptual dizziness or central sensitization." The provider taught Plaintiff exercises to perform at home.

On October 28, 2022, Plaintiff met with a resident in the Mayo Clinic's neurology department. AR 567-72. Plaintiff reported near constant itching beginning in 2009, along with intermittent numbness when lying on his back, resolved with position change. He denied "orthostatic lightheadedness," but did report getting "lightheaded and short of breath with episodes of palpitations and . . . some intermittent disequilibrium, worse with eyes closed." He also reported excessive sweating on his chest with exertion or high heart rate. He noted a "remote history of IV drug use, cocaine, [and] methamphetamines" (as a teenager (AR 710)) and a "previous history of excessive alcohol use," drinking a "fifth of whiskey per day" for around "4 or 5 years, around

2000-2005." He said he currently drank ten beers a week. His review of systems included complaints of fatigue, loss of appetite, night sweats, visual problems, shortness of breath, chest pain or pressure, rapid heartbeat, nausea, lightheadedness, loss of balance, weakness in arms or legs, numbness or shooting pain in extremities, anxiety, loss of interest in doing things over the last two weeks, and excessive daytime sleepiness. The doctor opined that symptoms and objective examination[12] could be consistent with a small fiber neuropathy, noting Plaintiff's EMG was negative for large fiber neuropathy, initial labs for causes of neuropathy were unremarkable, and his history of excessive alcohol use could contribute to fiber neuropathy; she recommended he quit drinking altogether. The doctor stated Plaintiff's symptoms and examination could also be consistent with ganglionopathy. She noted he had undergone a tilt test two days prior, which did not show "autonomic failure or . . . orthostatic intolerance"; it was noted the chest sweat was "of uncertain clinical significance and may be related to medication effects (nortriptyline)." *See* AR 606-07. The doctor recommended he remain on nortriptyline, which "provide[d] complete symptomatic relief." The supervising physician reviewed the resident's notes and emphasized the "reduced length-dependent pinprick and temperature sensory loss" on objective examination. He recommended "proceed[ing] with an epidermal nerve fiber biopsy and some additional laboratory workup looking for causes of small fiber neuropathy," and if no etiology was found (which he thought likely), continue management with nortriptyline. The nerve fiber

---

[12] The ALJ summarized the objective examination as follows:

> The sensory examination noted vibratory and proprioceptive sensation intact throughout. However, length dependent (-1) four limb temperature impairment, up to the forearms bilaterally, up to the mid-shin on the right, up to the ankle on the left was noted. Also, a pin impairment (-1) in the hands and forearms, normal in the lower extremities was also noted. Additionally, the claimant's gait was noted to be steady with normal steps and heel toe walking was also normal.

AR 21; *see also* AR 569.

biopsy (on November 1) did not show evidence of a small fiber neuropathy, but neurology continued to recommend "alcohol cessation and . . . symptomatic use of nortriptyline." AR 551-52. Neurology noted a negative result lowered concern "for a primary neurologic cause of pruritic." The doctor also suggested considering the addition of alpha lipoic acid supplement.

On November 1, 2022, Plaintiff met with a cardiology resident at the Mayo Clinic. AR 533-40. He said in the last ten years, his palpitations (heart racing) had become more severe and frequent, going from once every forty-five days to "in recent years," multiple times a day, lasting for twenty to thirty minutes. Associated symptoms included chest tightness, dizziness (room spinning and unbalanced), lightheadedness, significant fatigue, shortness of breath, diaphoresis, shortness of breath, nausea the past few months, and loss of appetite (since not eating led to a lower heartrate and less episodes). He reported lying down and drinking four gallons of water daily helped. He said he took naps throughout the day and could not do most activities. Plaintiff reported that his diltiazem dosage had recently doubled in mid-October (to 240 mg) at his request because his heart rate was still in the 115s. Since increasing the dosage, his heart rate had decreased to the 90s, but he still reported significant fatigue. He also noted his blood pressure increased to the 160/110 range when he started metoprolol, sometimes with accompanying blurred vision (but no headaches). The treatment note reflects "[s]ymptoms have only mildly responded and remain significant/life limiting despite" medications. His secondary hypertension work-up with metanephrines was unremarkable (one result was mildly high, likely due to nortriptyline use (AR 674)); a Holter monitor worn for 16 hours on October 26 and 27 showed "sinus rhythm with marked sinus arrythmia and premature supraventricular complexes," with heart rate varying from 77 to 166 beats per minute for an average rate of 108 (*see* AR 596); his six hour blood pressure monitor on October 27 showed elevated blood pressure (average 135/92); and an echo on November 1 showed normal heart structure and function (*see* AR 554). The

doctor noted that despite Plaintiff "trying to indicate symptomatic events" while wearing the Holter monitor, "it appears to not have worked so we are not sure if his episodes corresponded with any findings," and there are not "any sustained tachycardias on our [H]olter to explain the findings." Without clear documentation on the Holter of the cause of his symptoms, the doctor did not recommend proceeding with an ablation, due to the risks; instead, the doctor recommended a thirty-day Holter monitor. The doctor also recommended addressing "his abnormal overnight oximetry results." For hypertension, the doctor suggested lowering blood pressure with lifestyle modifications such as ceasing smoking and alcohol use. The attending physician agreed, noting he would certainly not recommend a sinus node ablation. A Mayo Clinic internist summarized these results for Plaintiff during a follow-up appointment via telehealth on November 7, 2022. AR 673-74.

Plaintiff wore a Holter monitor from November 1 to 29, 2022. AR 679. It showed a baseline rhythm of "sinus with intermittent sinus arrhythmia"; no premature ventricular contractions; no premature atrial contractions; and five supraventricular tachycardia events (the longest showed 56 beats and maximum pulse 134). Plaintiff reported "27 symptomatic events of 'palpitations,' 'shortness of breath,' 'dizziness,' 'chest pain,' 'nausea,' and 'blurred vision'" while wearing the Holter monitor, but during these events, the "rhythm was sinus with intermittent sinus arrythmia" with a heart rate varying from 76 to 146 beats per minute with no ectopy seen.

On November 26, 2022, Plaintiff underwent a sleep study. AR 755. It showed moderate obstructive sleep apnea.

On December 6, 2022, Plaintiff had a telehealth visit with Mayo cardiology. AR 671-73. The cardiologists explained that there was "a bit of [supraventricular tachycardia]" on the Holter monitor, but no prolonged episodes and no major abnormalities," and Plaintiff's reported palpitation symptoms frequently did not correlate with the EKG findings. The doctors believed no further testing or intervention was

needed other than "a program that will control his heart rate to the best extent"; they did not recommend ablation. Plaintiff reported he "continue[d] to be significantly hypertensive at home in the 160s-170s systolic." To control his blood pressure, the doctors recommended decreasing his diltiazem dosage (to 120 mg) and replace metoprolol succinate with carvedilol (12.5 mg twice a day). The doctors directed Plaintiff to record his blood pressure daily and call back in a week.

On December 15, 2022, telephone notes from Dr. Farid's cardiology practice reflect that Plaintiff canceled his ablation procedure because the Mayo Clinic thought "it is actually his liver that is causing his problems" and "recommended that he only pursue medication management at this time." AR 663. Plaintiff had a telephone visit with a nurse practitioner in Dr. Farid's cardiology office on December 19, 2022. AR 660-62. NP Mahoney noted the Mayo Clinic changed metoprolol to carvedilol and reduced his diltiazem dosage, with improvement in symptoms and blood pressure control. His medication list included carvedilol (Coreg, 12.5 mg, twice daily); diltiazem (120 mg daily); and nortriptyline (100 mg nightly) (but not Cymbalta). The provider noted that an "[e]vent monitor in [November 2022] did show episodes of [paroxysmal supraventricular tachycardia] but did not appear to correlate with reported symptoms." Plaintiff denied current chest pain, shortness of breath, palpitations, presyncope, and syncope. He reported his palpitations were doing well on medications, with an average daily heart rate in the 90s to 110s; he did not wish to pursue an electrophysiology study with Dr. Farid's office at this time. He said that his average blood pressure at home was 140/90 and that the Mayo Clinic had mentioned adding another medication if needed. He was still waiting for his CPAP[13] machine to arrive, and he hoped treating his sleep apnea would improve his fatigue, palpitations, and blood pressure. He noted the Mayo Clinic was continuing to evaluate his elevated AST (aspartate transaminase) and ALT (alanine

---

[13] Continuous Positive Airway Pressure.

transaminase) results (liver function tests).[14] The provider directed him to continue monitoring his blood pressure and heart rate daily at home and follow up in six months.

On December 29, 2022, Plaintiff underwent a liver MRI[15] elastogram only at the Mayo Clinic. AR 676-77. It showed "marked diffuse hepatic steatosis" and "no fibrosis by elastography." His mean fat fraction was 27% (normal is less than 6%) and mean liver stiffness 2.8 kPa (which could be normal or could indicate inflammation). A short note reflects abnormal liver enzymes and a "primary [diagnosis]" of "fatty liver alcoholic palpitations." AR 671.

On January 1, 2023, Plaintiff spoke on the phone with a Mayo cardiology doctor about his blood pressure. AR 671. The doctor recommended starting losartan (25 mg) and continuing to monitor.

On January 5, 2023, the Social Security Administration denied Plaintiff's request for benefits on initial review. AR 55-72.

On January 18, 2023, the Mayo Clinic took bloodwork related to Plaintiff's fatty liver diagnosis (copper assay serum and ceruloplasmin). AR 704-05. Both values were within normal levels.

On February 24, 2023, Plaintiff met with Dr. Ray for adjustments related to back and neck pain. AR 728-31. Plaintiff reported the results of his recent consult with the Mayo Clinic for "problems with tachycardia and elevated liver functions," stating his "liver functions remain elevated," the MRI showed "significant fatty liver but no fibrosis," he had not had a "liver biopsy yet," and he had started medications to "reduce his heart rate," but it remained "on the higher side." His blood pressure was 124/62 and pulse 109. Later, on March 7, 2023, Plaintiff's blood pressure was 126/72 and pulse 90 while at an appointment with Dr. Ray related to urology issues. AR 725-28.

---

[14] ***Liver Function Tests***, Mayo Clinic, (Jan. 18, 2025) https://www.mayoclinic.org/tests-procedures/liver-function-tests/about/pac-20394595.

[15] Magnetic resonance imaging.

On March 28, 2023, Plaintiff met with Dr. Ray for back and neck adjustments. AR 723-25. He reported "unexplained tachycardia" that "cardiology" could not find a cause for and that taking medications "help" but do "not eliminate[] the symptoms." The treatment note reflects Plaintiff "state[d] he does have sleep apnea and cannot wear a mask or at least if he uses it on a regular basis it[']s not helping his other symptoms." Plaintiff asked about the Inspire device for sleep apnea. He also reported "some significant shortness of breath difficulties . . . with swallowing at times." His blood pressure was 132/82 and pulse 103. Dr. Ray referred him to an Ear, Nose, and Throat specialist to inquire about the Inspire device, since he had "not been able to tolerate the [CPAP] mask," and directed him to continue to follow up with cardiology and the liver specialist.

On March 31, 2023, Plaintiff attended a psychological consultative examination with Paul Sundell, PhD, ordered by the Social Security Administration. AR 709-12. Plaintiff reported extreme fatigue that made it difficult for him to perform household tasks in a timely manner, which he attributed to his arrthymia "creat[ing] less than optimal oxygen in his body on a regular basis." He said he needed to "pace himself to clean dishes," do laundry for himself and his children, "and to prepare meals," and "eat[s] out 90% of the time" every other week when he had custody of his three kids (ages 14, 12, and 10). He ordered groceries online. He stated he showered, shaved, and combed his hair independently but reported difficulties dressing himself "in a timely manner." He denied mowing or shoveling snow, stating his older children or neighbors helped with those tasks. He reported going to bed no later than 10 p.m. but struggling to fall asleep before midnight due to pain and intrusive thoughts, waking up at 7 a.m. to take the kids to school, and taking naps during the day. He also noted difficulty focusing and tracking conversations, with "poor" ability to understand and remember verbal instructions (and good ability to understand written instructions). He said he "watche[d] movies when he fe[lt] up to it." He noted plans to file for bankruptcy (when he had the money) and

depending on his parents for financial support. Plaintiff made "grunting noises occasionally" during the examination, which he explained helped him "breathe more deeply" when he experienced shortness of breath. He reported "rarely drink[ing] alcohol" and smoking half a pack a day. His answers to questions on a depression screening test indicated "moderate" depression and on an anxiety screening test showed "mild" anxiety. On objective examination, the provider noted normal speech, thought processes, eye contact, grooming, and "cooperative" and "loquacious nature," with limited judgment and insight. The provider also noted Plaintiff "walked slowly to the therapy room." He denied currently taking "psychotropic medications" and could not recall ever using such medications; he also denied plans to "seek psychotherapy." Plaintiff's focus was on doctors' inability to treat his physical health conditions, which made it difficult for him to obtain and maintain a job. The consultative examiner noted "no concerns" with his cognitive abilities and an ability to maintain employment if he could resolve his physical issues.

On May 2, 2023, Plaintiff met with Dr. Thomas Heineman, MD. AR 811-13. Plaintiff reported using the CPAP machine for at least four hours a night for the last two months. He noted irritation from the full-face mask, claustrophobia, and feeling like it choked him, as well as air leakage and lack of control breathing. Dr. Heineman indicated that surgery is required for patients who cannot tolerate the CPAP mask, with the first step being a drug-induced sleep endoscopy "to identify the patterns and severity of upper airway collapse contributing to the patient's obstructive sleep apnea." Dr. Heineman also discussed "upper airway nerve stimulation (Inspire Therapy) for patients with substantial obstruction from the base of tongue," noting it could be an option depending on Plaintiff's endoscopy results.

On May 5, 2023, Plaintiff had a pre-operative appointment with Dr. Ray before his planned endoscopy for sleep apnea. AR 719-22. His blood pressure was 124/92 and pulse 109. On objective examination, Dr. Ray noted appropriate behavior, speech,

affect, and mood. Dr. Ray's treatment note reflects Plaintiff consumed one to four alcoholic drinks a week. AR 774.

On May 17, 2023, Plaintiff underwent the endoscopy. AR 803, 818-20. It showed "no evidence of complete concentric palatal obstruction," and Dr. Heineman concluded Plaintiff was a candidate for uvulopalatopharyngoplasty. "This procedure involves the surgical removal of the soft tissue on the back of the throat and the uvula (soft palate) to widen the pharynx and expand the airway." Plaintiff elected to schedule the procedure. The medication list from this visit reflects an increased losartan dosage (25 mg twice daily). AR 773.

On May 18, 2023, Plaintiff obtained an abdominal ultrasound for bloating and abdominal pain. AR 858-60. It showed an enlarged liver and "diffuse hepatic steatosis" (fatty liver).[16]

On June 6, 2023, Plaintiff presented to the ER with urology issues. AR 866-68. He reported drinking three to four beers three to four times a week. His blood pressure was 131/81 and his pulse was 95.

On June 12, 2023, Plaintiff had a pre-operative appointment with a nurse practitioner in Dr. Farid's cardiology practice before his sleep apnea surgery. AR 848-51. Plaintiff reported he continued "to have intermittent tachycardia and palpitations with heart rates up to 110 [beats per minute], but has improved some." He denied chest pain, shortness of breath, presyncope, or syncope, but reported occasional dizziness and light headedness. An EKG that day showed "sinus rhythm with incomplete [right bundle branch block]," and heart rate 95 beats per minute. His blood pressure was 114/80. The nurse practitioner noted Plaintiff was "stable" from a cardiovascular standpoint and could proceed with surgery.

---

[16] ***Fatty Liver Disease (MASLD)***, Mayo Clinic (Mar. 13, 2026), https://www.mayoclinic.org/diseases-conditions/fatty-liver-disease-masld/symptoms-causes/syc-20354567.

Later that same day, Plaintiff had a pre-operative appointment with Dr. Ray. AR 845-47. He noted his "paroxysmal supraventricular tachycardia" caused symptoms of "a fluttering sensation, palpitations and shortness of breath" and was acutely controlled for purposes of surgery. The objective examination showed normal mood, affect, and speech. Plaintiff's blood pressure was 120/44 and pulse 105.

On July 7, 2023, Plaintiff called Dr. Farid's office, stating that neurology wanted to make medication adjustments but needed cardiac approval. AR 1114. He also stated he wanted to proceed with "an ablation that was previously canceled per Mayo recommendations."

On July 18, 2023, Plaintiff had a telehealth appointment with Dr. Farid. AR 1190-94. Dr. Farid noted that his studies did not show "any fast onset or offset so the differential diagnosis is either crista [atrial tachycardia] versus sinus tachycardia." Dr. Farid discussed a "possible [electrophysiology] study and ablation," but Plaintiff said he underwent an electrophysiology study in the past in Michigan and "was told there was no abnormal heart rhythm and no ablation was performed." Dr. Farid discussed upping medication dosages, but Plaintiff wanted to leave everything as is. Dr. Farid said he would try to get Plaintiff's medical records from Michigan and directed him to return in six months. The Michigan electrophysiology study from July 2013 appears in Dr. Farid's treatment notes. AR 1049-51. The study showed normal atrioventricular conduction and no inducible arrythmias to explain Plaintiff's symptoms. The Michigan doctors noted "recurrent very symptomatic and daily episodes of palpitations in a young patient suffering from COPD and alcohol abuse." The Michigan doctors at the time continued Plaintiff on diltiazem (180 mg, twice daily).

Plaintiff's sleep apnea surgery ultimately did not occur until August, and on August 1, 2023, he had another pre-operative appointment with Dr. Ray. AR 1110-13. His blood pressure was 134/84 and pulse 104. Dr. Ray's treatment note reflects Plaintiff smoked a half pack a day and drank ten beers a week. Dr. Ray observed appropriate

dress, behavior, speech, affect, and mood. His EKG showed "no acute changes and sinus tachycardia." Dr. Ray cleared Plaintiff for surgery. Dr. Heineman performed the sleep apnea surgery on August 8, 2023, and Plaintiff was discharged the next day. AR 1101-09. The treatment note reflects Plaintiff drank ten beers a week, and his blood pressure was 129/94 and heart rate 102; and later, 140/86 and heart rate 104. At a post-operative follow-up appointment on August 16, 2023, Plaintiff was healing well.

On August 18, 2023, Plaintiff met with Dr. Ray for back and neck adjustments. AR 1152-54. Plaintiff reported his "sleep [wa]s much better" after surgery "to remove the tonsil and cut back uvula" to treat sleep apnea. His blood pressure was 106/58 and pulse 104. Dr. Ray noted blood pressure "was a little bit low" and pulse "elevated," so he recommended follow-up with Ear, Nose, and Throat and cardiology.

On August 30, 2023, the Social Security Administration denied Plaintiff's request for benefits on reconsideration. AR 73-96.

On October 18, 2023, Plaintiff met with Dr. Ray for back and neck adjustments. AR 1283-85. Plaintiff reported his history of tachycardia had been "extensively evaluated" with "no specific etiology noted." He noted he planned to get a third opinion from the cardiologists at the University of Iowa, but he could not be seen there until February. Plaintiff reported his recent sleep apnea surgery "helped his breathing symptoms," but he still had "some fatigue and heart rate increases." His blood pressure was 138/88 and pulse 128.

On November 11, 2023, Plaintiff had a follow-up appointment with Dr. Heineman. AR 1306-08. Plaintiff reported doing well post-operatively with mild snoring and improvement in sleeping. Dr. Heineman ordered an at-home sleep study for further evaluation due to continued snoring.

On February 5, 2024, the ALJ held a telephone hearing, at which Plaintiff and a vocational expert (VE) testified. AR 33-34. Plaintiff testified that his high blood pressure, high heart rate, peripheral neuropathy, and small fiber neuropathy caused lack

of mental clarity, confusion, extreme fatigue, numbness of limbs, unbalanced equilibrium, lightheadedness, dizziness, exhaustion, and lack of grip when using his hands. AR 43. The ALJ asked whether Plaintiff could sit at a desk and fold cardboard boxes all day. AR 43. Plaintiff said he could not work more than one or two hours doing anything and "keep mental clarity." AR 44. For a simple job like folding boxes, he thought the issue would be with equilibrium and being unable to stay in one place for too long without "feeling adrift of going sideways periodically" and his legs going numb. AR 44-45. He also noted "due to the small fiber neuropathy," his hands locked up, felt numb, and cramped with "repeated functions," causing him to drop and break things. *Id.* He also said high blood pressure significantly affected his vision, making it blurred to the point that he could not even read sometimes. AR 44. He testified that he had to do household chores like laundry and dishes in ten-minute spurts. AR 46. At the time of the hearing, his 13- and 15-year-old boys were living with him, and his 11-year-old daughter had recently moved in with his wife in Florida. AR 47. He said his kids packed their own lunches because he would "probably forget to put something in there," and they cleaned their own rooms, as well as did chores and duties around the house he was incapable of. AR 48.

The ALJ issued a written opinion on April 5, 2024, following the five-step process outlined in the regulations[17] to determine whether Plaintiff was disabled. AR 14-26. The ALJ found Plaintiff suffered severe impairments of cardiac dysrhythmias (arrhythmias); depressive, bipolar, and related disorders; peripheral neuropathy; and anxiety and

[17] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." ***Grindley v. Kijakazi***, 9 F.4th 622, 628 (8th Cir. 2021) (quoting ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)**. The claimant bears the burden of persuasion to prove disability. ***Goff***, 421 F.3d at 790.

obsessive-compulsive disorders. AR 16. At step three, the ALJ found Plaintiff's impairments did not meet or equal a listing, making findings that Plaintiff suffered moderate limitations in concentrating, persisting, and maintaining pace, and in adapting or managing oneself; and mild limitations in interacting with others and understanding, remembering, or applying information. AR 17-18. To aid in steps four and five, the ALJ determined Plaintiff's RFC, finding Plaintiff could perform sedentary work[18] as additionally limited with only occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolding; and simple routine tasks. AR 19. The ALJ found Plaintiff could not perform any of his past relevant work (at step four) but relied on VE testimony that he could perform other jobs that existed in significant numbers in the national economy, such as bill sorter, survey worker, or data clerk (at step five). AR 24-25, 52-53. The VE had testified no work would exist if the Plaintiff were additionally limited with two extra fifteen-minute breaks a day, one in the morning and one in the afternoon. AR 53. The ALJ found Plaintiff was not disabled from May 3, 2022, through April 5, 2024, the date of the decision. AR 25-26.

The Appeals Council denied Plaintiff's request for review on March 26, 2025 (AR 1-3), making the ALJ's decision that Plaintiff was not disabled the final decision of the Commissioner.[19] Plaintiff filed a timely complaint in this court (Doc. 4).[20] The parties briefed the issues (Docs. 12, 14-15) and consented to the exercise of jurisdiction by a United States magistrate judge (Doc. 11).

---

[18] Sedentary work requires the ability to stand and walk for a total of two hours in an eight-hour day. *See* **20 C.F.R. § 404.1567(a), 416.967(a)** (defining sedentary work as requiring walking and standing "occasionally"); ***Social Security Ruling (SSR) 96-9P***, 61 Fed. Reg. 34478, 34480 (July 2, 1996) ("'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.").

[19] *See* **20 C.F.R. §§ 404.981, 416.1481**.

[20] *See* **20 C.F.R. § 422.210(c)**.

## *II. DISCUSSION*

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[21] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[22] The court "do[es] not reweigh the evidence or review the factual record de novo."[23] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[24]

Plaintiff argues that the ALJ erred by discounting his subjective complaints of his limitations. Plaintiff also argues the ALJ's decision is internally inconsistent, since the ALJ found Plaintiff suffered "moderate limitations" as part of the step three analysis but did not account for those limitations in the RFC, such as by limiting Plaintiff's ability to handle change in the workplace.

### *A. Subjective Complaints*

Plaintiff argues that the ALJ erred in failing to fully credit his subjective complaints. Plaintiff argues that his statements "unequivocally" establish that he is more limited than the ALJ found in his RFC. Plaintiff contends that his primary barrier to working is his lack of mental clarity. He asserts that the ALJ erred by failing to include

---

[21] ***Grindley***, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[22] ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007).

[23] ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).

[24] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

an RFC limitation related to his need to be off task, nap throughout the day, and miss work.

When evaluating a claimant's subjective complaints, the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."[25] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."[26] The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary,"[27] or "inconsistencies in the record as a whole."[28] Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[29]

Plaintiff argues that the ALJ mischaracterized his activities of daily living. In finding only mild limitations in understanding, remembering, or applying information, the ALJ relied in part on Plaintiff's ability to "prepare his own meals and drive a car." AR 18. In finding moderate limitations in adapting or managing oneself, the ALJ noted the claimant "practices good personal hygiene habits" and "is able to care for his three

---

[25] ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord* ***Polaski***, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986). The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. ***Jones v. Callahan***, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

[26] ***Black***, 143 F.3d at 386; *see also* **20 C.F.R. §§ 404.1529, 416.929**.

[27] ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002).

[28] ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993).

[29] ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

children, prepare his own meals, drive a car, and shop in stores." *Id.* In discussing RFC, the ALJ found claimant's testimony inconsistent with the evidence because "the claimant can care for his three children, prepare his own meals, do laundry, drive a car, shop in stores, and handle money." AR 20. Plaintiff argues that the ALJ ignored that his ability to care for his children is limited, since he testified he cannot pack their lunches; that he "requires frequent breaks and assistance from others" when doing laundry or cooking; and that he struggles with basic personal care. But the ALJ did not have to adopt Plaintiff's testimony about his activities of daily living and could instead rely on other evidence (in his function reports and the treatment records—which support that Plaintiff's activities of daily living were somewhat limited, but not to the extent Plaintiff testified and now asserts). In addition, as the ALJ noted, to the extent Plaintiff suggested he struggled with personal hygiene, the treatment notes never reflected that Plaintiff looked disheveled or anything other than well groomed. The ALJ could consider Plaintiff's activities of daily living, along with other factors, in determining the weight to assign his subjective complaints.[30]

The ALJ also outlined the conservative nature of Plaintiff's treatment. Plaintiff first sought treatment for his worsening elevated pulse in April 2022, and he had quit or

---

[30] *See* ***Gonzales v. Barnhart***, 465 F.3d 890, 895-96 (8th Cir. 2006). Plaintiff's cited cases are distinguishable. *See* ***Tilley v. Astrue***, 580 F.3d 675, 681 (8th Cir. 2009) (under regulations then in effect, ALJ had to provide good reasons to discount treating-source opinion, and instead, ALJ relied solely on claimant's activities of daily living that included caring for her ailing husband, briefly working as a census taker, and hanging wallpaper, all of which resulted in flares in fibromyalgia pain that required medical treatment, which went unacknowledged by the ALJ); ***Soria v. Colvin***, No. 13-CV-4014, 2014 WL 1203271, at *7 (N.D. Iowa Mar. 24, 2014) (substantial evidence did not support ALJ's finding that claimant could do housework based on evidence that claimant drove his wife to work every day and could only drive short distances due to back pain; nor did it support ALJ's finding that claimant's testimony that he had to stay home due to his depression and pain meant that he took "care of his (school aged) children every day").

lost his job by the next month prior to starting any medications. In May through October 2022, local cardiologists worked to adjust his medications to bring his pulse and blood pressure under control, and cardiologists at the Mayo Clinic continued this treatment from October to January 2023. Then, throughout 2023, Plaintiff's condition seemed stable, with a heart rate usually between 100 and 110, and he remained on the same medications (diltiazem 120 mg, carvedilol 12.5 mg, and losartan 25 mg increased to 50 mg by May). In July 2023, he declined further medication adjustments from his local cardiologist. Plaintiff had suffered from issues with high heart rate since 2013 but was able to work full time for years with medications (and variably reported worsening symptoms in May 2022 when he stopped working, but also for "years" prior). Treatment notes in the record prior to his alleged onset date reflect normal heart rate in July and December 2021 and February 2022, but an elevated pulse of 121 in September 2021 (when he was still working).

Plaintiff also testified about limitations caused by his peripheral neuropathy, including an inability to do repetitive motions with his hands and issues with dropping things he was holding. But as the ALJ noted, Plaintiff reported this condition was well-controlled with nortriptyline, and he sought limited treatment for it during the relevant period.

Overall, substantial evidence supports the ALJ's failure to fully credit Plaintiff's subjective complaints of his limitations. The ALJ recognized that Plaintiff suffers from severe heart issues that cause fatigue and make exertion difficult, but the ALJ accounted for these symptoms by limiting Plaintiff's RFC to sedentary (seated) work with additional limitations. On this record, based on the deferential standard of review, I cannot say that substantial evidence did not support the ALJ's decision.

### *B. Moderate Limitations at Step Three*

During the third step of the disability determination, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1.[31] The listing for mental impairments, Listing 12.00, requires the ALJ to evaluate the claimant's functioning for the four "paragraph B" criteria "on a five-point rating scale consisting of none, mild, moderate, marked, and extreme limitation."[32] Here, the ALJ found Plaintiff suffered moderate limitations in two of the "paragraph B" criteria: concentrating, persisting, or maintaining pace; and adapting or managing oneself (the ALJ found mild limitations in the remaining categories). AR 18. Concentrating, persisting, or maintaining pace "refers to the abilities to focus attention on work activities and to stay on task at a sustained rate."[33] Adapting or managing oneself

---

[31] **20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii)**.

[32] **20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)**. The five rating points are defined as follows:

> a. No limitation (or none). You are able to function in this area independently, appropriately, effectively, and on a sustained basis.
> b. Mild limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.
> c. Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.
> d. Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.
> e. Extreme limitation. You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.

***Id.*** Some of the cases talk about "often" suffering a limitation in concentration, persistence, or pace, language used by a prior version of the regulations and which correlates to a "moderate" limitation under the current regulations. *Compare* **20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3)** (1995), *with* **20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4)** (2018).

[33] ***Id.*,** **§ 12.00(E)(3)**.

> Examples include: initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing

"refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting."[34] Plaintiff argues that the ALJ's RFC limitation to "simple routine tasks" does not account for "pacing issues (i.e., off-task time) or the moderate adaptation" findings at step three and renders the ALJ's decision "internally inconsistent."

Plaintiff relies on a case in which the court recognized that "moderate limitations in concentration, persistence, or pace" at step three "are consistent with [an RFC limitation to] . . . simple, routine, repetitive tasks."[35] Even though the ALJ in that case additionally limited the claimant's RFC to "few workplace changes," the court did not suggest a limitation on change was necessary for consistency with the "paragraph B" criteria.[36] And Plaintiff does not cite any case in which a court has held a moderate

---

> activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

***Id.***

[34] ***Id.*, § 12.00(E)(4)**.

> Examples include: responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

***Id.***

[35] ***Hosch v. Colvin***, No. C15-2014, 2016 WL 1261229, at *5 (N.D. Iowa Mar. 30, 2016) (collecting cases); *see also* ***Henderson v. Berryhill***, No. 15 CV 1624, 2017 WL 747611, at *8-*10 (E.D. Mo. Feb. 27, 2017) (rejecting claimant's argument that "limiting [p]laintiff to simple, routine work . . . does not sufficiently account for [claimant's] moderate limitations in concentration, persistence, or pace").

[36] *See also* ***Howard v. Massanari***, 255 F.3d 577, 582 (8th Cir. 2001) (an RFC limiting claimant to "simple, repetitive, routine tasks adequately captures . . . [moderate] deficiencies in concentration, persistence, or pace"). I further note that some courts have held "an RFC need not include specific limitations on concentration, persistence or pace merely because the ALJ concluded at Step Three that the claimant had moderate limitations in a particular area." ***Loeckle v. Saul***, No. C19-3031-LTS, 2020 WL 5518620, at *9 (N.D. Iowa Sept. 14, 2020), *vacated*

adaptive limitation at step three requires something more in the RFC than a limitation to simple, routine tasks.[37]

The ALJ's "paragraph B" findings at step three do not render the opinion internally inconsistent. Moderate limitations in concentration, persistence, or pace, and in adaptive functioning are adequately captured by the ALJ's RFC limitation to simple, routine tasks. The ALJ did not need to include an RFC limitation related to being off task or working at a reduced pace simply because of the findings at step three.

## *III. CONCLUSION*

I **affirm** the Commissioner's decision and direct the Clerk of Court to enter judgment in favor of the Commissioner.

**SO ORDERED** November 17, 2026.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

*and remanded*, No. 20-3373, 2021 WL 5365233 (8th Cir. June 4, 2021) (vacating to address Appointments Clause challenge); *but see* ***Scott v. Berryhill***, 855 F.3d 853, 857 (8th Cir. 2017) (recognizing that under *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996), an RFC "that omits the effects of concentration, persistence, or pace deficiencies that the ALJ has found is not sufficient"). Since I find that the ALJ's RFC *does* capture the moderate limitations found at step three, I need not address whether this is required.

[37] *Cf.* ***Brenda J. T. v. Comm'r of Soc. Sec.***, No. 24-CV-00980, 2025 WL 2933193, at *10 (N.D.N.Y. Aug. 31, 2025) ("[C]ourts have found that limiting a plaintiff to simple and routine work with occasional interaction with coworkers and the public is consistent with limitations in the area of 'ability to adapt or manage oneself.'" (collecting cases)), *report and recommendation adopted*, 2025 WL 2775914 (Sept. 30, 2025).